UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ALEJANDRO RIVERA HERNANDEZ,
*on behalf of himself, FLSA Collective
Plaintiffs, and the Class*,

*Plaintiff*,

– against –

PRIME STRUCTURE, INC., PRIME
STRUCTURE NY, INC., MARATHON
BUILDERS, INC., BIG APPLE
DESIGNERS NY LLC, ISREAL STERN,
and SUBCONTRACTORS 1-50,

*Defendants*.

---

**MEMORANDUM & ORDER**
23-cv-09487 (NCM) (LKE)

**NATASHA C. MERLE**, United States District Judge:

Alejandro Rivera Hernandez ("plaintiff") on behalf of himself, putative FLSA Collective Action plaintiffs, and a putative class, brings this action against Prime Structure, Inc., Prime Structure NY, Inc., ("Prime defendants"), Isreal Stern, Marathon Builders, Inc. ("Marathon"), Big Apple Designers NY LLC ("Big Apple"), and Subcontractors 1-50 ("Subcontractor defendants") (collectively "defendants"), for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., New York Labor Law ("NYLL"), N.Y. Lab. L. § 195, and breach of contract, or, in the alternative, unjust enrichment based on defendants' alleged failure to pay wages for all hours worked and to provide wage notices and accurate wage statements. Second Am. Compl., ECF No. 38 ("SAC"). Before the Court is defendants' Motion to dismiss pursuant to Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6).[1] For the reasons stated below, defendants'
Motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

The following factual allegations are derived from plaintiff's second amended
complaint, which the Court accepts as true for purposes of this Motion. In September
2016, plaintiff was hired by Isreal Stern, the owner and president of the Prime defendants,
to work as a laborer. SAC ¶ 47. Throughout his time there, plaintiff was scheduled to work
five days per week from 7:00 a.m. to 6:00 p.m., for a total of 11 hours per day or 55 hours
per week. SAC ¶ 48. From the start of his employment to December 2017, plaintiff was
paid $15 per hour. SAC ¶ 49. From January 2018 to February 2019, plaintiff was paid $19
per hour. SAC ¶ 49. From March 2019 to March 2021, plaintiff was paid $21 per hour.
SAC ¶ 49. From April 2021 until his termination in May 2022, plaintiff was paid $25 per
hour. SAC ¶ 49.

At Stern's direction, the Prime defendants subcontracted work to Marathon, Big
Apple, and additional Subcontractor defendants, which are unknown to plaintiff at this
time. SAC ¶ 24. Stern, on behalf of the Prime defendants, loaned their employees to
defendants to complete the subcontracted work. SAC ¶ 24. Plaintiff was supervised by
foremen of the Prime defendants, Marathon, Big Apple, and Subcontractor defendants,
and he could see the logos of the subcontractors on clothing and equipment at worksites.
SAC ¶ 25. All defendants were required to approve the specific sums that plaintiff and

---

[1]    The Court hereinafter refers to the Memorandum of Law in Support of Defendants'
Motion to Dismiss the Complaint, ECF No. 46, as the "Motion"; Plaintiff's Memorandum
of Law in Opposition to Defendants' Motion, ECF No. 47, as the "Opposition"; and the
Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss, ECF
No. 48, as the "Reply."

others were being paid, and defendants collaborated to manage and track plaintiff's and other workers' time records, scheduling, and compensation. SAC ¶¶ 26, 29.

*Subcontractors*

One example of this kind of subcontractor arrangement is the Prime defendants' agreement with Marathon wherein Marathon agreed to "Cast in Place Concrete" at one of the Prime defendants' projects. *See* SAC, Ex. B, ECF No. 38-2 ("Subcontractor Agreement"); SAC ¶ 22. The Subcontractor Agreement gave the Prime defendants and Marathon joint responsibility for managing and supervising projects. SAC ¶ 22. Plaintiff and other workers received paychecks processed by Marathon. SAC ¶ 26. Though payment was received from Marathon, the funds originated from the Prime defendants since they were acting as a general contractor outsourcing work to its subcontractor. SAC ¶ 26.

Prime defendants also had an agreement with Big Apple wherein plaintiff was required to fill out time sheets provided by Big Apple for hours worked on the project. The time sheets identified the Prime defendants as the general contractor and displayed the email "billing@bigappledesigners," indicating that the form was used to bill the Prime defendants in their role as general contractor for the workers' compensation. SAC ¶ 27; *see also* SAC, Ex. D, ECF No. 38-4. To keep track of their hours, plaintiff and other workers were required to download an HR and payroll management app called Fingercheck that was tailored for Big Apple. SAC ¶ 28.

*Defendants' Wage and Hour Practices*

When plaintiff worked more than 40 hours in a week, defendants failed to pay plaintiff the required overtime premium. For example, plaintiff's paystub beginning on April 24, 2022, and ending on April 30, 2022, shows that he worked 60 hours, but he was

paid at $25 per hour for all 60 hours worked and thus was not paid the overtime premuim of time and a half for each hour worked over 40. SAC ¶ 50; *see also* SAC, ECF No. 38-3.

Further, plaintiff did not ordinarily clock in and out with a system that kept precise track of his hours. SAC ¶ 51. Instead, he wrote down the official beginning and end times of his shifts on defendants' timesheets. SAC ¶ 51. Because this system did not keep track of when workers stopped working for lunch, defendants automatically deducted 30 minutes from plaintiff's hours. SAC ¶ 51. But plaintiff alleges that he did not have a "free and clear lunch," as he was required to work through each meal break. SAC ¶ 52. As a result of this practice, plaintiff worked at least 2.5 hours per week that were uncompensated. SAC ¶ 52.

Additionally, plaintiff's timesheets reflected that his scheduled shifts ended exactly on the hour, or sometimes, half-hour. However, plaintiff's actual work shifts ended about 15 minutes later than the time that he was scheduled because he was required to complete the tasks he was working on before leaving for the day. SAC ¶ 53. As a result of this practice, plaintiff alleges that he worked at least 1.25 hours per week that were uncompensated. SAC ¶ 53. Plaintiff alleges that he and other workers would complain to their foremen about defendants' wage violations, specifically failure to pay for all hours worked and failure to pay overtime premiums, and the foremen would agree to relay plaintiff's concerns to defendant Stern. SAC ¶ 17.

### Reporting and Notice of Wages

Plaintiff and other workers of the Prime defendants were paid exclusively in cash until November 2021. SAC ¶ 54. After November 2021, they were paid by check after filling out a W-9 form. SAC ¶ 54. In 2021, plaintiff was paid a total of $725 by check and was paid in cash for the remainder of the year. However, the Prime defendants and

Marathon submitted a Form-1099 for that year which represented that plaintiff was paid $725, failing to report plaintiff's cash wages. SAC ¶ 54. Plaintiff also alleges that defendants misclassified him as a 1099 independent contractor when he was a bona fide employee. SAC ¶ 57. Thus, defendants did not pay the employers' share of Federal Insurance Contributions Act ("FICA") taxes, which plaintiff alleges left him liable for the employer's share of FICA taxes and reduced his eligibility for Social Security benefits. SAC ¶ 59. The second amended complaint also alleges that defendants failed to provide plaintiff with wage notices and accurate wage statements that reflected the actual number of hours worked. This allegedly allowed defendants to hide their responsibility and deprived plaintiff of timely compensation and the ability to contest the pay provided by defendants. SAC ¶ 67.

## DISCUSSION

When deciding a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014). "Factual disputes are typically not the subject of the Court's analysis, as Rule 12 motions probe the legal, not the factual, sufficiency of a complaint." *Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of N.Y., Inc.*, 64 F. Supp. 3d 459, 468–69 (E.D.N.Y. 2014). That is, "the issue" on a motion to dismiss "is not whether a plaintiff will ultimately prevail," but instead whether a plaintiff is "entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, "[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125 (2d Cir. 2023).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must state "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although the Court takes all factual allegations contained in the complaint as true, it does not do so for legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" in a complaint. *Iqbal*, 556 U.S. at 678.[2]

## I.    FLSA AND NYLL Claims

Plaintiff alleges FLSA and NYLL violations arising from defendants' failure to pay wages for all hours worked, failure to pay the overtime premium, and failure to provide wage notices and accurate wage statements. Plaintiff brings these claims against Prime defendants, who hired plaintiff as a laborer, and defendants Marathon, Big Apple, and Subcontractor defendants, each of whom he alleges exerted joint control over him as employers. Defendants argue that plaintiff has failed to demonstrate the existence of an employee-employer relationship under the FLSA and NYLL and instead, plaintiff was a bona fide independent contractor. Reply 5.[3] Thus, none of the defendants are his employer, let alone his joint employer. Mot. 17. Defendants further contend that the relationship between Prime defendants, Marathon, Big Apple, and the Subcontractor

---

[2]    Throughout this opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

[3]    Throughout this opinion, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

defendants is a legitimate general-subcontractor relationship in the construction industry involving separate, independent entities. Reply 7–8. This is the predominate focus of defendants' challenge to plaintiff's FLSA and NYLL claims. Defendants' arguments fail for the reasons discussed below.

### A.  Joint Employer Status

To be held liable under the FLSA, an entity must qualify as an employer. *Hugee v. SJC Grp., Inc.*, No. 13-cv-00423, 2013 WL 4399226, at *3 (S.D.N.Y. Aug. 14, 2013). FLSA's definition of employer is broad, and includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The NYLL is similarly broad, defining an employer as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." NYLL § 190(3). Courts apply the same tests to determine whether an individual or entity is an employer under the FLSA and the NYLL. *Weng v. New Shanghai Deluxe Corp.*, No. 19-cv-09596, 2022 WL 5434997, at *4 (S.D.N.Y. Oct. 7, 2022).

Because the definition of employer is broad, there are circumstances where a worker is simultaneously employed by two or more ostensibly separate employers. This creates a question of whether the two employers are so entangled as to create a "joint employment" relationship whereby, for FLSA and NYLL purposes, they are treated as one entity, jointly and severally liable for wages due to an employee. *See Martin v. Sprint United Mgmt.* Co., 273 F. Supp. 3d 404, 421 (S.D.N.Y. 2017) (quoting 29 C.F.R. § 791.2(a)).

There are several types of business relationships traditionally prone to joint-employment: (1) companies that use staffing agencies to provide additional workers, *see*

*Barfield v. N. Y. C. Health & Hosps. Corp.*, 537 F.3d 132, 143 (2d Cir. 2008), (2) franchise relationships, *see Olvera v. Bareburger Grp. LLC*, 73 F.Supp.3d 201, 207 (S.D.N.Y. 2014), and (3) subcontracting relationships, *see Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 63–66 (2d Cir. 2003).

In determining whether there is an employment relationship, courts evaluate the "economic reality" of the relationship, "looking beyond rigid corporate constructs to consider the functional realities facing employees." *Newman v. ASA Coll.*, Inc., 754 F. Supp. 3d 521, 537 (S.D.N.Y. 2024). The economic reality test is a flexible concept to be determined case-by-case based on the totality of the circumstances. *Barfield*, 537 F.3d at 141–42; *see also Dias v. Cmty. Action Project, Inc.*, No. 07-cv-05163, 2009 WL 595601, at *6 (E.D.N.Y. Mar. 6, 2009) (finding that whether two entities are joint employers is "essentially [a] factual question[] that cannot be disposed of on a motion to dismiss.").

There is no independent test under the FLSA for joint employment, rather an entity is a joint employer if it meets the FLSA's definition of employer and another entity also meets the definition as it relates to a single worker. *New York v. Scalia*, 490 F. Supp. 3d 748, 776 (S.D.N.Y. 2020). "Joint employment exists when the facts establish that employment by one employer is not completely disassociated from employment by the other employer." *Id.* at 758. When evaluating whether separate but closely affiliated legal entities should be treated as a single employer, the query centers on whether the employers "handle certain aspects of their employer-employee relationships jointly." *Clinton's Ditch Co-op Co. v. N.L.R.B.*, 778 F.2d 132, 137 (2d Cir. 1985).

There are two aspects of the economic reality test: (1) whether a formal employment relationship existed between the workers and the alleged employer, as to distinguish between independent contractors and employees, and (2) whether an entity

lacking "formal control" nevertheless could be considered a joint employer due to the "functional control" exercised over workers. *Newman*, 754 F.Supp. 3d at 537 (citing *Barfield,* 537 F.3d at 143). The Second Circuit has identified four core factors to assess formal control over employees: whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). "No one of the four factors standing alone is dispositive." *Herman v. RSR Secret Servs Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). Satisfying the *Carter* factors is sufficient to establish joint employment under the FLSA and NYLL, but it is not necessary. *See Newman*, 754 F. Supp. 3d at 537. Even in the absence of formal control, a joint employment relationship will be found where an alleged employer exercises functional control over the workers in question. *Id*.

### i. Formal Control Over Plaintiff

Contrary to defendants' arguments, plaintiff has plausibly alleged facts indicating defendants' formal control over plaintiff in light of the totality of the circumstances, satisfying the formal control test for joint employment under the FLSA and NYLL.

As to the first *Carter* factor—power to hire and fire—defendants argue that plaintiff's allegation that he was originally hired by Prime defendants contradicts his allegation that he was hired by all defendants in September 2016. Reply 5. Plaintiff alleges that he was hired by the Prime defendants in September 2016 and was loaned to the Subcontractor defendants to complete subcontracting work. SAC ¶ 24. Plaintiff alleges that the subcontractors consented to having plaintiff work on their project. Opp'n 10. However, plaintiff does not allege that the subcontractors played a role in hiring him as a

laborer, nor had the authority to terminate his employment. Further, plaintiff does not allege any facts that would allow the Court to reasonably infer that because the subcontractors acquiesced to plaintiff working on a project, they also had the power to hire or fire him. Thus, the first factor weighs against finding that plaintiff has plausibly alleged joint employment.

As to the second factor—supervision and control—defendants argue that the supervision plaintiff alleges he received from the defendants was to facilitate the completion of  projects in a timely manner; thus, defendants' supervision was related to construction site operations as opposed to the general responsibilities of the job. Mot. 13–14. *See Hugee*, 2013 WL 4399226, at *6 ("To satisfy the joint employer inquiry, [p]laintiff should have alleged that the supervision he received from [the alleged employer] was in relation to the general responsibilities of his job, and not merely operations"). In the context of subcontracting relationships, "extensive supervision of a plaintiff's work is indicative of an employment relationship," however, "such extensive supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Zheng,* 355 F.3d at 74–75; *see Rutherford Food Corp. v. McComb,* 331 U.S. 722, 726 (1947) (suggesting the slaughterhouse owner's close scrutiny of the boners' work played a role in setting the boners' schedule).

Plaintiff plausibly alleges that defendants collectively supervised him and that such supervision amounted to control over the terms and conditions of his employment. Specifically, Stern supervised individual workers, including plaintiff. SAC ¶ 16. Not only did Stern have the power and authority to supervise and control all workers on the Prime defendants' construction projects as the general contractor, he also delegated this supervisory authority to Marathon, Big Apple, and the Subcontractor defendants, making

plaintiff functionally indistinguishable from the workers directly hired by the subcontractors. SAC ¶¶ 15, 25. Indeed, plaintiff alleges that Prime defendants and Marathon had a subcontractor agreement which stated that the parties had joint responsibility to supervise projects. SAC ¶ 22.

The subcontractors oversaw the state of the project to ensure that it would be completed in a timely manner. *See* SAC ¶¶ 16, 22. Plaintiff alleges that he was supervised by Prime defendants' foremen, as well as subcontractors' foremen. SAC ¶¶ 24–25. Foremen are in charge of worksites, and their "time is divided between [labor] and supervision."[4] It is reasonable to infer that in this role, the foremen provided plaintiff, as a laborer on a project, with directives related to his job responsibilities on-site.

 Plaintiff also alleges defendants effectively controlled his work schedule. Specifically, plaintiff could not leave worksites until certain tasks were completed for the day, often resulting in his shift ending about 15 minutes later than scheduled. SAC ¶ 53. In essence, the complaint alleges that the subcontractors could, and did, extend plaintiff's work day to ensure he completed his job responsbilities. *See Antenor v. D & S Farms*, 88 F.3d 925, 934 (11th Cir. 1996) (noting growers exercised control over farmworkers when their supervision of the workers affected the workers' schedule).

Moreover, plaintiff alleges that he and his fellow workers would complain to the subcontractor's foremen about defendants' failure to pay for all hours worked, and the foremen would promise to relay workers' concerns to Stern. SAC ¶ 17. Though plaintiff alleges that Stern was ultimately responsible for defendants' pay policies, SAC ¶ 17, it is notable that plaintiff directed his complaints to the subcontractors, demonstrating that

---

4       *Foreman*, Oxford English Dictionary, https://www.merriam-webster.com/dictionary/foreman.

Stern and defendants jointly controlled the conditions of workers' employment. *See Raymond v. Mid-Bronx Haulage Corp.*, No. 15-cv-05803, 2017 WL 1251137, at *8 (S.D.N.Y. Mar. 31, 2017) (complaints regarding hours that were directed to alleged employer suggest supervision and control over workers conditions of employment). Thus, the second factor weighs in favor of finding that plaintiff has plausibly alleged joint employment.

As to the third factor—rate and method of payment—defendants argue that plaintiff cannot identify any terms in the Subcontractor Agreement that support his allegation that Prime defendants funded payroll for Marathon employees working on Prime construction projects. Mot. 16. Regardless of the contractual obligations in the Subcontractor Agreement, plaintiff alleges that defendants shared compensation responsibilities, evidenced by the cash payments received from Prime defendants, checks received from Marathon, and timesheets from Big Apple. *See* SAC ¶¶ 26, 51, 54; SAC, ECF No. 38-1, ECF No. 38-2, ECF No. 38-3. All defendants were required to approve the specific sums that plaintiff and others were being paid, and defendants collaborated to manage and track plaintiff and other workers' time records, scheduling, and compensation. SAC ¶¶ 26, 29.

Moreover, contrary to defendants' argument, the contractual obligations in the Subcontractor Agreement alone are not outcome determinative. At this stage, since the economic reality of an alleged employment relationship is determined based on the totality of the circumstances, "any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Herman*, 172 F.3d at 139. Thus, the Subcontractor Agreement, which delineates legal obligations, does not end the inquiry, and the Court may consider additional relevant circumstances. *See Red Apple*

*Media, Inc. v. Batchelor*, 729 F. Supp. 3d 350, 373 (S.D.N.Y. 2024) (noting that the mere fact a contract labels an employment relationship "is not, by itself, dispositive[.]"). Accordingly, the third factor weighs in favor of finding that plaintiff has plausibly alleged joint employment.

As to the fourth and final *Carter* factor—retention of employment records—defendants argue that Prime defendants' timesheets, Big Apple's timesheets, and Marathon's paystubs cover different periods with no alleged connection to each entity collectively. Reply 7. However, whether the dates of the paystubs overlap is beside the point. The central issue is whether each defendant maintained any portion of plaintiff's employment records as to indicate that defendants handle certain aspects of their employment-employer relationship, including compensation and time-keeping, jointly.

Plaintiff received paystubs and timesheets from one defendant for work done to benefit all defendants. Despite the dates reflected on each defendant's timesheets and paystubs, at all times plaintiff worked to advance the defendants' collective interests by helping them complete joint construction projects. *See Chang Yan Chen v. Lilis 200 W. 57th Corp.*, No. 19-cv-07654, 2020 WL 7774345, at *3 (S.D.N.Y. Dec. 30, 2020) ("Under a joint-employer theory, an employee, employed by one entity . . . is at the same time constructively employed by another entity[.]").

Plaintiff has sufficiently alleged that each defendant maintained some portion of his employment records. Indeed, plaintiff has provided exhibits of such records including timesheets from Prime defendants, *see* SAC ¶ 20; SAC, Ex. A, ECF No. 38-1, timesheets from Big Apple, *see* SAC ¶ 27; SAC, Ex. D, ECF No. 38-4, as well as paychecks from Marathon, *see* SAC ¶ 26; SAC, Ex. C, ECF No. 38-3. Plaintiff also kept track of his hours on Fingercheck, a payroll management app tailored for Big Apple. SAC ¶ 28. Thus, the

fourth factor weighs in favor of finding that plaintiff has plausibly alleged joint employment.

*    *    *

Accepting all of plaintiff's allegations as true and drawing all reasonable inferences in his favor, plaintiff has sufficiently pled that defendants exercised formal control over him and thus were his joint employer for purposes of his FLSA and NYLL claims.

### B. Defendant Stern as Employer

Relatedly, defendants argue that plaintiff has not sufficiently alleged that defendant Stern was his employer under the FLSA and NYLL. Mot. 18. "Once an entity is found to be an employer within the meaning of the FLSA, a Court must also consider whether individual defendants associated with the employer-entity are individually liable[.]" *Li v. Chinese Nail Salon Ass'n of E. Am. Inc.*, No. 20-cv-6390, 2024 WL 866248, at *4 (E.D.N.Y. Feb. 28, 2024). Individual liability is similarly grounded in the "economic reality" of the employer-employee relationship, but also takes into account an individual's "operational control," or the degree to which the individual possesses "control over a company's actual operations in a manner that relates to a plaintiff's employment." *Id.*

Here, plaintiff alleges that defendant Stern is the owner and president of the Prime defendants. SAC ¶ 14. In this role, he manages the daily operations and compensation structures of the Prime defendants. SAC ¶ 15. Additionally, he would visit worksites to discuss the state of the project and pick up and drop off equipment, and also supervised plaintiff when on-site. SAC ¶ 16. Therefore, plaintiff has sufficiently alleged that defendant Stern, in his role as president and operator of Prime defendants, was associated with the employer-entities, and thus he was also plaintiff's employer and individually liable under the FLSA and NYLL.

### C. Failure to Provide Proper Wage Notices and Statements

Defendants present an additional argument challenging plaintiff's NYLL claim. Defendants argue that plaintiff lacks standing to challenge violations of the wage notice and wage statement requirements pursuant to NYLL because he fails to allege the requisite concrete harm or injury in fact stemming from the purported violations. Specifically, defendants contend that plaintiff's alleged underpayment injury does not flow from the lack of accurate wage statements and notices, but instead from defendants' alleged illegal pay practices and failure to pay overtime. Mot. 8.

NYLL § 195 requires that employers provide a wage notice upon the hiring of an employee and regular wage statements throughout an individual's employment. *See* NYLL §§ 195(1), (3). When raised in federal court, claims for violation of these statutory provisions are subject to Article III standing requirements. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021).  To establish standing, a plaintiff must demonstrate that (1) he has "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant[s];" and (3) judicial relief would likely redress plaintiff's injury. *Id.* at 423.

In *Guthrie v. Rainbow Fencing Inc.*, the Second Circuit clarified the necessary showing for NYLL  § 195 claims to satisfy the Article III standing requirement of a concrete injury in fact. 113 F.4th 300 (2d Cir. 2024). The *Guthrie* court held that "a plaintiff must show some causal connection between the lack of accurate notices and the downstream harm" to demonstrate concrete injury. *Id.* at 308. There are a range of "possible injuries" that can result from violations of NYLL  § 195. *Id.* These injuries include the inability to: apply for public benefits, bank loans, and credit cards due to lack of documentation; seek redress based on a determination that "they are being robbed by

the employer;" or ensure that the correct tax, insurance, and other deductions are made on an employee's behalf. *Id.* at 310.

A plaintiff can demonstrate injury by showing that they "would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided." *Id.* at 308. Further, courts have found sufficient injury to demonstrate standing for NYLL 195 claims where plaintiffs "aver[red] that [d]efendants' alleged failure to provide wage notices and wage statements caused [them] to endure uncertainty regarding [their] wages and prevented [them] from taking action to correct [d]efendants' wage and hour violations." *Rosas v. M & M LA Solucion Flat Fixed Inc.*, No. 23-cv-01212, 2024 WL 4131905, at *12 (E.D.N.Y. Sept. 10, 2024), *report and recommendation adopted*, ECF Order (Sept. 30, 2024); *see also Barbosa v. Phoenix Sutton Str. Inc.*, 2025 WL 1078877, at *3 (E.D.N.Y. Apr. 10, 2025) (finding standing where plaintiffs plausibly alleged that not being provided accurate documentation which informed them of their hours worked, wage, overtime rates, and the identity of their employers caused them concrete harm).

While a "plaintiff need not . . . establish an injury that is greater than or different from the loss of wages or overtime pay alleged in their lawsuit," the plaintiff must show "some causal connection between" the wage notice and statement violations "and the alleged downstream harm." *Ramos v. Allied Concrete Indus. Inc.*, No. 2:23-cv-03366, 2024 WL 5168766, at *1 (E.D.N.Y. Dec. 19, 2024); *see e.g.*, *Roma v. David Carmili, Physician, P.C.*, 761 F. Supp. 3d 481, 490 (E.D.N.Y. 2024) (finding plaintiff demonstrated standing by, among other things, alleging that defendants' failure to provide wage statements prevented her from "correcting issues with deductions and discrepancies" in her pay).

Here, plaintiff alleges that defendants' failure to provide him with wage notices and accurate wage statements that reflected the total number of hours worked and rates of pay, including overtime hours and overtime rates, deprived him of the ability to contest underpayment and deprived him of timely compensation. SAC ¶ 67. However, this is inconsistent with plaintiff's allegation that he would "complain about [d]efendants' wage violations (failure to pay for all hours worked and failure to pay overtime premiums . . .) to their foremen" who would then agree to share plaintiff's concerns with defendant Stern. SAC ¶ 17. Thus, from plaintiff's own allegations, he knew that defendants were engaged in wage violations, the type of violations they were engaged in, and raised those concerns with a supervisor who agreed to share it with his alleged employer. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings. . . that are contradicted [] by statements in the complaint itself[.]").

Accepting plaintiff's allegations as true, that he was not paid for all hours worked and overtime, plaintiff was nevertheless aware of this and raised it with, at least, the foremen. Thus, these allegations do not support a reasonable inference that his alleged employers were able to "hide" their wage violations and therefore cause informational harm. *See Castillo v. Hollis Delicatessen Corp., No. 22-cv-5476 , 2024 WL 4107258,* at *1 n.1 *(E.D.N.Y. Sept. 6, 2024); see also Lock v. Costco Wholesale Corp.*, No. 23-cv-07904, 2024 WL 4728594, at *5 (E.D.N.Y. Nov. 8, 2024) (rejecting plaintiffs' allegation as contradictory where plaintiffs asserted that defendant's inaccurate wage statements hindered their ability to challenge wage violations because plaintiffs were aware that they worked more than 40 hours per week). Even viewing the allegations in the light most favorable to plaintiff, plaintiff has failed to demonstrate that defendants' failure to provide

wage statements or notice caused him to not be able to assess and raise the wage violations.[5] Accordingly, defendants' Motion to dismiss is granted with respect to plaintiff's NYLL §§ 195(1) and (3) claims.

## II.    Fraudulent Filing of Information Returns

Section 7434 provides a private cause of action for individuals harmed by the filing of a fraudulent information return. 26 U.S.C. § 7434(a). It provides: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." *Id*. Defendants contend that Section 7434 was not intended to impose liability for submitting an amount less than an individual's wages, rather the statute was intended to impose liability for over-reporting of wages that results in *additional* tax liability. Mot. 26–27. Plaintiff argues that regardless of whether the amount paid to plaintiff is under-reported or over-reported, the central issue in deciding whether plaintiff has stated a claim under Section 7434 is whether defendants intentionally submitted a fraudulent information return that listed an inaccurate amount of wage payments made to plaintiff. Opp'n 21–23. The Court agrees.

To state a claim under Section 7434, plaintiff must allege that "(1) the defendant issued an information return; (2) the information return was fraudulent; and (3) the

---

[5]    Plaintiff also alleges that if defendants had provided wage statements and wage notice it would have impacted defendants' conduct or improve plaintiff's litigation position. Specifically, that defendants would have had to increase plaintiff's wages to correspond to the hours actually worked or acknowledge, by way of the wage statement, that plaintiff's wages did not correspond to the hours the worked. AC 68–69. However, such speculation is not adequate to confer Article III standing. *See Quieju v. La Jugueria Inc.*, No. 23-cv-264, 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023) ("This speculative chain of possibilities does not establish that plaintiff's injury was fairly traceable to defendants' alleged violations[.]").

defendant willfully issued the fraudulent information return." *Sarr v. VEP Assocs. LLC*, No. 22-cv-04386, 2024 WL 1251600, at *5 (E.D.N.Y. Mar. 25, 2024).

A Section 7434 claim can only be brought "where there is a falsehood made to the IRS with respect to payments made to the plaintiff bringing the action." *Pacheco v. Chickpea at 14th St. Inc.*, No. 18-cv-06907, 2019 WL 2292641, at *4 (S.D.N.Y. May 30, 2019), *report and recommendation adopted*, 2019 WL 3749318, at *2 (Aug. 8, 2019). "Information return" means any statement described in section 26 U.S.C. § 6724(d)(1)(A), which includes "any statement of the amount of payments to another person" with respect to income tax withheld. *Id.* at *3. This includes a Form 1099 which is used to report payments to non-employee independent contractors. *See*, *e.g.*, *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 594 (E.D.N.Y. 2012).

In *Katzman v. Essex Waterfront Owners*, LLC, the Second Circuit assessed what is required to state a claim for relief under Section 7434. 660 F.3d 565 (2d Cir. 2011). The Court focused on the plain text of the statute while acknowledging its legislative history. The Court held the private right of action created by Section 7434 applies only if a person *willfully files* a fraudulent information return. *Id.* at 568 ("[A]n allegation that a person intentionally failed to file a required information return does not state a claim under [Section] 7434"). Further, the Court reasoned that this conclusion is consistent with the "overall statutory scheme," in that 26 U.S.C. § 6721(a)(2)(A) of the Internal Revenue Code ("IRC") establishes penalties for failure to file an information return and 26 U.S.C. § 6722 of the IRC establishes penalties for failure to furnish payee statements. *Id.* at 569 ("These provisions, however, do not create a private right of action. It is therefore apparent that Congress knows how to distinguish between the failure to file an information return and the willful filing of a fraudulent information return."). Therefore,

the central question is whether an information return was actually submitted, and if so, was it fraudulent.

By the plain text of the statute, plaintiff has plausibly alleged a claim. Specifically, plaintiff alleges that (1) defendant issued an information return, a Form 1099; SAC ¶ 54, (2) the information contained in the 1099 was fraudulent, in that it inaccurately stated the wages earned, and (3) defendant intentionally issued the fraudulent information return; SAC ¶ 54. Nevertheless, defendants argue that this is inadequate to state a claim for relief because the fraudulent information submitted to the IRS reported that plaintiff was paid less, rather than more, income.

Defendants rely on *Pacheco v. Chickpea 14th St. Inc.* to support the proposition that Section 7434 is applicable only in scenarios involving alleged over-reporting of plaintiff's wages that result in additional tax liability. 2019 WL 3749318, at *1 (S.D.N.Y. Aug. 8, 2019). However, defendants' reliance on *Pacheco* is misplaced and conflates under-reporting of payments with the failure to report payments altogether. *Pacheco* concerned an outright failure to submit an information return, rather than submitting fraudulent, inaccurate information regarding a particular plaintiff's wages. *Id.* at *2. There, defendants reported the wages of some, but not all, of their employees. One of the employees for which they omitted income was plaintiff. The Court found that omitting the full amount of one employee from a Form 941 was equivalent to failure to submit a tax form, which is not actionable under the IRC. *Id.*; *see also Francisco v. NYTex Care, Inc.*, No. 19-cv-04606, 2019 WL 6716634, at *2, *4 (E.D.N.Y. Dec. 10, 2019).

Here, defendants are alleged to have affirmatively submitted an information return as to plaintiff, and that information return contained inaccurate, fraudulent information. Specifically, plaintiff alleges Prime defendants and Marathon submitted a Form 1099 in

2021 that only reflected the $721 that plaintiff was paid by check, and defendants intentionally omitted the payments made in cash. *See Cano v. Tremson Recycling LLC,* No. 24-cv-01612, 2025 WL 964552, at *12 (S.D.N.Y. Mar. 14, 2025) (finding allegations that defendants knowingly submitted information returns reflecting only the wages paid to plaintiff by check and omitting those paid to him in cash were sufficient to establish a violation of Section 7434); *see also Rosario v. Fresh Smoothies LLC*, No. 20-cv-05831, 2021 WL 5847633, at *6 (S.D.N.Y., Dec. 9, 2021) (same).

Moreover, the complaint alleges that defendants intentionally misclassified plaintiff as an independent contractor to reduce their FICA tax liability. SAC ¶ 57; *see also Czerw v. Lafayette Storage & Moving Corp.,* No. 16-cv-06701, 2018 WL 5859525, at *3 (W.D.N.Y., Nov. 9, 2018) (finding that the plausibility of plaintiff's Section 7434 claim of willful fraud was bolstered by the fact that defendants misclassified plaintiff as an independent contractor instead of an employee for the entirety of his employment). Accordingly, plaintiff has plausibly alleged a violation under Section 7434 and defendants' Motion is denied.

### III.    Breach of Contract

Plaintiff alleges that when he accepted an offer of employment from defendant Stern, the parties entered into a contract, and the covenant of good faith and fair dealing implicitly required defendants to pay plaintiff in accordance with all applicable laws, which imposed a duty to abide by the IRC and pay all required FICA taxes. SAC ¶ 110. Plaintiff contends that defendants breached this duty by paying plaintiff in cash without withholding proper deductions. SAC ¶ 111. Defendants also allegedly misclassified plaintiff as an independent contractor and did not file proper W-2 forms. SAC ¶ 111.

"[T]he implied covenant [of good faith] can only impose an obligation consistent with other *mutually agreed upon terms in the contract* and cannot add to the contract a substantive provision not included by the parties." *Childers v. N.Y. & Presbyterian* Hosp., 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) (emphasis added). Plaintiff has failed to plausibly allege the existence of an agreement between plaintiff and any defendant, express or implied. In fact, plaintiff's second amended complaint does not identify any mutually agreed upon terms of the alleged contract sufficient to infer an intention on the part of any defendant to be bound in a contractual relationship with plaintiff. *See id*. at 312–13; *see also Ancile Inv. Co. v. Archer Daniels Midland Co*., 784 F.Supp.2d 296, 304–06 (S.D.N.Y. 2011) (dismissing breach of contract claim where the plaintiff did not allege facts suggesting that the defendant intended to be bound to the terms of the alleged implied contract). Accordingly, plaintiff's breach of contract claim is dismissed.

## IV.    Unjust Enrichment

In the alternative, plaintiff alleges that defendants unjustly enriched themselves by not paying FICA taxes for employees to reduce their tax liability, which will result in plaintiff being liable for the employer's share of FICA taxes and, upon retirement, diminished Social Security benefits because he did not pay enough into the system. SAC ¶ 114.

Unjust enrichment is a New York common law quasi-contract cause of action requiring the plaintiff to establish: (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution. *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018). The exclusive remedy for a tax refund is an action against the United States, thus a state law claim seeking a federal tax refund is preempted. *See McNeely v. Metro. Life Ins*. Co., 376 F. Supp. 3d 225, 230

(S.D.N.Y. 2019). "[T]he IRC does not explicitly create a private cause of action whereby an employee may sue an employer for a failure to make a required contribution." *Id.* (quoting *Ferro v. Metro. Ctr. for Mental Health*, No. 13 -cv-02347, 2014 WL 1265919, at *5 (S.D.N.Y. Mar. 27, 2014)).

In *McNeely*, the plaintiffs argued that the defendant unjustly enriched itself because it did not collect or pay any FICA taxes to the IRS for employees who were mischaracterized as independent contractors, which resulted in plaintiffs paying the combined employer and employee amount of FICA taxes. *Id.* at 230. The Court reasoned that the employer's share of FICA taxes was paid to the IRS, not to defendants, and therefore plaintiffs' unjust enrichment claims essentially sought a disguised tax refund. *Id.* at 230–31. As such, their state law claim for unjust enrichment on additional tax liability was preempted. *Id.* at 230 ("To allow these claims to move forward would undermine the IRS's administrative scheme, which allows individuals to file claims for tax refunds that they believe they need not have paid.").

Here, plaintiff similarly alleges that he overpaid FICA taxes to the IRS, therefore his unjust enrichment claim essentially seeks a disguised tax refund. *See Lehman v. USAIR Grp., Inc.*, 930 F. Supp. 912, 916 (S.D.N.Y. 1996). The proper avenue for plaintiff to recover the employer's share of FICA taxes is to file a claim for a tax refund through the IRS's administrative process. Accordingly, plaintiff's unjust enrichment claim is preempted by federal law and is therefore dismissed.

## CONCLUSION

Defendants' Motion to dismiss is **GRANTED** as to plaintiff's breach of contract, unjust enrichment, and NYLL Sections 195 wage notice and statements claims, and is

**DENIED** as to plaintiff's FLSA, Section 7434, and remaining NYLL claims. This case is referred to Magistrate Judge Lara K. Eshkenazi for pre-trial supervision.

**SO ORDERED.**


_____/s/ Natasha C. Merle___
NATASHA C. MERLE
United States District Judge


Dated:      June 27, 2025
            Brooklyn, New York

24